UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
-----------------------------------x
                                    :
In re PUBLIC OFFERING FEE           :
ANTITRUST LITIGATION                :        98 Civ. 7890 (LMM)
                                    :
-----------------------------------x        MEMORANDUM AND ORDER
                                    :
In re ISSUER PLAINTIFF INITIAL      :
PUBLIC OFFERING ANTITRUST           :        00 Civ. 7804 (LMM)
LITIGATION                          :
                                    :
-----------------------------------x
```

McKENNA, D.J.,

## 1.

Plaintiffs in the above actions (which have been consolidated for pretrial purposes) move, pursuant to Fed. R. Civ. P. 23(c)(1), for an order certifying the actions as class actions.[1]

Both actions allege that defendants, underwriters of initial public offerings ("IPOs"), violated Section 1 of the Sherman Act, 15 U.S.C. § 1, by colluding since 1994 to fix the underwriting fees charged to issuers of IPOs valued between $20 million and $80 million at seven percent of the proceeds of the IPOs.

> These actions allege an agreement among IPO underwriting firms to maintain underwriting fees for IPOs in the $20-80 million range at 7%. Over 95% of underwriter fees charged for these IPOs

---

[1] The Court has considered both Defendants' Surreply to Plaintiffs' Reply Memorandum in Support of Motions for Class Certification and Plaintiffs' Proposed Response to Defendants' Proposed Sur-Reply Respecting the Motion to Certify the Class, in addition to the preceding briefing.
The parties have taken discovery relevant to class certification.

during the period 1994-1998 were 7%.  No reason,
economic or otherwise, exists to support such
uniformity.  To the contrary, underwriting fees
should vary widely due to fixed costs and economies
of scale, economic conditions affecting the IPO
business, and extreme differences in risks that
exist when underwriting issuers range from Internet
companies to paper mills.  Also to the contrary, in
competitive markets (European) underwriting fees
are lower, and varied.  The reason for price
uniformity in the United States is obvious.
Defendants do not want to, and have agreed not to,
compete on fees in the market for underwriting mid-
sized IPOs.

(Pls'. Mem. at 2 (citations and footnote omitted).)[2]

The first action (98 Civ. 7890) is brought on behalf of

purchasers of securities offered in such IPOs, the second (00 Civ.

7804) on behalf of issuers of securities in such IPOs.  In the

second action, treble damages are sought, in the first declaratory

relief only.[3]

Plaintiffs propose to define the issuer class as follows:

All corporations and other entities (excluding
defendants and their respective parents,
subsidiaries and affiliates and issuers of
government securities) who, during the [period
November 1994 through the present], issued an
initial public offering of securities with an
aggregate value between $20 million and $80 million
using the services of any defendant.

---

[2] Plaintiffs describe "[t]he complaints filed by issuer companies
and purchasers [as] substantially alike."  (Id. at 2 n.1.)

[3] The claim for damages in the first action has been dismissed, in
substance because the purchasers are indirect purchasers without standing
under Illinois Brick Co. v. Illinois, 431 U.S. 720 (1977).  See In re
Public Offering Antitrust Litig., No. 98 Civ. 7890, 2004 WL 350696, at
*5-*8 (S.D.N.Y. Feb. 25, 2004).  The issuer plaintiffs have withdrawn
their application for certification under Fed. R. Civ. P. 23(b)(2).
(Pls'. Reply Mem. at 47 n.28.)

(Pls'. Mem. at 4.)  They propose to define the purchaser class as follows:

> All persons and entities (excluding defendants and their respective parents, subsidiaries and affiliates) who, during the [period November 1994 through the present], purchased initial public offering securities in an offering of IPO securities having an aggregate value between $20 million and $80 million using the services of any defendant.

(Id. (footnote omitted).)

**2.**

Initially, "[t]he party seeking to certify a class bears the burden of demonstrating numerosity, commonality, typicality, and adequacy." Caridad v. Metro-North Commuter R.R., 191 F.3d 283, 291 (2d Cir. 1999) (citing Fed. R. Civ. P. 23(a)).  "Before certifying a class, a district court must be persuaded, 'after a rigorous analysis, that the pre-requisites of Rule 23(a) have been satisfied.'" Id. (quoting General Telephone Co. v. Falcon, 457 U.S. 147, 161 (1982)).

"Additionally, a class action may be maintained only if it qualifies under at least one of the categories provided in Rule 23(b)." In re Visa Check/MasterMoney Antitrust Litig., 280 F.3d 124, 133 (2d Cir. 2001).  Plaintiffs seek certification of the issuer class under Rule 23(b)(3) for damages, and certification of the purchaser class under Rule 23(b)(2) for injunctive relief. (Pls'. Mem. at 4.)

Defendants oppose class certification for two principal reasons:

> First, the proposed class representatives have done little more than lend their names to this litigation and are wholly inadequate under Rule 23(a)(4) of the Federal Rules of Civil Procedure. Second, plaintiffs have failed to establish that common issues will predominate over individual issues, as required by Rule 23(b)(3).

(Defs'. Opp'n. at 1.)

**3.**

The Court first considers Rule 23(a).

The numerosity requirement -- that "the class is so numerous that joinder of all members is impracticable," Fed. R. Civ. P. 23(a)(1) -- is satisfied. Plaintiffs represent that the members of the issuer class exceed 1,000, and those of the purchaser class are "hundreds or thousands" in the case of each IPO (Pls'. Mem. at 7), and defendants do not contend that these figures are not substantially correct or that this requirement has not been met.

The commonality requirement -- that "there are questions of law or fact common to the class," Fed. R. Civ. P. 23(a)(2) -- is also met. Plaintiffs' allegations of the existence of a price-fixing conspiracy raise a common question, and the Court does not understand defendants to dispute that there is a common question sufficient to satisfy this requirement.

The typicality requirement -- that "the claims or defenses of the representative parties are typical of the claims or defenses of the class," Fed. R. Civ. P. 23(a)(3) -- is also met. "The typicality requirement of Rule 23(a)(3) is satisfied when the claims of the representative plaintiffs and the absent class members are based on the same legal or remedial theory and there are no antagonistic interests between the two." In re Indus. Diamonds Antitrust Litig., 167 F.R.D. 374, 379 (S.D.N.Y. 1996). Here, all plaintiffs and putative class members proceed on the same theory, that they "paid a supracompetitive price for [the IPO underwriting services of the defendants] as a result of defendants' conspiracy to stabilize prices." Id. Antagonistic interests of the class members have not been shown. Again, the Court does not understand defendants to dispute typicality in the Rule 23(a)(3) sense.

The adequacy requirement -- that "the representative parties will fairly and adequately protect the interests of the class," Fed. R. Civ. P. 23(a)(4) -- is disputed.

**4.**

Initially, it is clear that a class representative must be a member of the class. Rule 23 says as much ("[o]ne or more members of a class may sue or be sued as representative parties . . .," Fed. R. Civ. P. 23(a)), and the courts have repeated the rule. See Falcon, 457 U.S. at 156 ("We have

repeatedly held that 'a class representative must be part of the class and "possess the same interest and suffer the same injury" as the class members.'" (quoting <u>East Texas Motor Freight Sys., Inc. v. Rodriguez</u>, 431 U.S. 395, 403 (1977))); <u>Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.</u>, 222 F.3d 52, 59 (2d Cir. 2000) ("[W]e affirm the district court's denial of Baffa's motion for certification because he is not a member of the class.")

Beyond that:

> The requirement that the named plaintiffs adequately represent the class is motivated by concerns similar to those driving the commonality and typicality requirements, namely, the efficiency and fairness of class certification. To achieve these ends, Rule 23(a)(4) requires that plaintiffs demonstrate that "class counsel is qualified, experienced, and generally able to conduct the litigation." Plaintiffs must also demonstrate that there is no conflict of interest between the named plaintiffs and other members of the plaintiff class.

<u>Marisol A. v. Giuliani</u>, 126 F.3d 372, 378 (2d Cir. 1997) (quoting <u>In re Drexel Burnham Lambert Group, Inc.</u>, 960 F.2d 285, 291 (2d Cir. 1992)) (other citations omitted). "Generally, adequacy of representation entails inquiry as to whether: 1) plaintiff's interests are antagonistic to the interest of other members of the class and 2) plaintiff's attorneys are qualified, experienced and able to conduct the litigation." <u>Baffa</u>, 222 F.3d at 60 (citation omitted).

As the Second Circuit also noted in <u>Baffa</u>, the Supreme Court has "expressly disapproved of attacks on the adequacy of a

class representative based on the representative's ignorance." 222 F.3d at 61 (citing Surowitz v. Hilton Hotels Corp., 383 U.S. 363, 370-74 (1966)). Denial of class representative status requires more than ignorance: the situation must be such that "'the class representatives ha[ve] so little knowledge of and involvement in the class action that they would be unable or unwilling to protect the interests of the class against the possibly competing interests of the attorneys.'" Maywalt v. Parker & Parsley Petroleum Co., 67 F.3d 1072, 1077-78 (2d Cir. 1995) (quoting Kirkpatrick v. J.C. Bradford & Co., 827 F.2d 718, 727 (11th Cir. 1987)).

**5.**

The two named plaintiffs proposed as representatives of the issuer plaintiff class are Cordes & Company Financial Services, Inc. ("Cordes") and the Unsecured Creditors Trust of Equalnet Corporation ("Creditors Trust"). (Pls'. Mem. at 4.)

With respect to Cordes, plaintiffs state:

> Plaintiff Cordes . . . asserts the underlying claim of Western Pacific Airlines, a Denver-based airline that paid a 7% underwriting fee to defendants in connection with the company's 1995 IPO. In 1997, Western Pacific went bankrupt. The trustee for the Western Pacific bankruptcy filed this litigation in 2001 (along with co-plaintiff Equalnet Communications Corporation), and prosecuted it until 2004. At that time, Cordes purchased the Western Pacific claim in a public, court-supervised auction. Cordes paid $11,000 for the right to prosecute this claim on behalf of class members, and to obtain Western Pacific's pro-rata portion of any recovery in the class action.

(Pls'. Reply Mem. at 7.)

As to the Creditors Trust, plaintiffs state that it "asserts the claim of Equalnet Communications Corporation . . ., which paid 7% to defendants in its 1995 IPO and filed for bankruptcy in 1998." (Id. at 13 (footnote omitted).) Equalnet Corporation (whose creditors the Creditors Trust represents) is, it is not disputed, a subsidiary of Equalnet Communications Corporation, the IPO issuer. The Creditors Trust acquired from Equalnet Communications Corporation the claim which it now asserts in the present action by foreclosure of certain security interests (including the claim); if the claim is successful, one-third of the proceeds will go to debtors of Equalnet Communications Corporation and two-thirds to the Creditors Trust. (Dep. of Darryl S. Laddin (former trustee of Creditors Trust) 40-41, Dec. 20, 2001 (in Withers Decl., May 24, 2005, Ex. 4).)

It is plain that Cordes and the Creditors Trust are not members of the proposed issuer class and that, as a consequence -- and assuming arguendo that they meet the other qualifications for class representation -- they cannot represent the issuer class.[4]

Plaintiffs in response cite the undisputed proposition that antitrust claims are assignable. That is beside the point. To allow Cordes or the Creditors Trust to represent the proposed

---

[4] It bears emphasizing that the Creditors Trust acts for creditors of Equalnet Corporation, not Equalnet Communications Corporation. The Court is not suggesting that Equalnet Communications Corporation, or a committee of that corporation's creditors, would automatically be excluded as class representatives.

class would, in effect, treat class membership as a transferable asset, and that could plainly lead to very serious problems indeed in the class action field.

**6.**

The two named plaintiffs proposed as representatives of the purchaser class sought to be certified are Harold Gillet and Irving Braun, purchasers of securities in IPOs. The Court does not find that their interests are antagonistic to the interests of other class members or that their counsel are not qualified, experienced and able to conduct this litigation, nor that Mr. Gillet and Mr. Braun are affected by ignorance or disinterest to the degree that they would be unable or unwilling to protect the class against counsel. They are acceptable as class representatives for other purchasers of securities from IPOs.

**7.**

The Court next considers Rule 23(b)(3), under which plaintiffs seek certification of the claim of the issuer class for damages. The rule provides:

> An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:
>
> * * *
>
> (3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters

> pertinent to the findings include: (A) the
> interest of members of the class in individually
> controlling the prosecution or defense of separate
> actions; (B) the extent and nature of any
> litigation concerning the controversy already
> commenced by or against members of the class; (C)
> the desirability or undesirability of concentrating
> the litigation of the claims in the particular
> forum; (D) the difficulties likely to be
> encountered in the management of a class action.

Fed. R. Civ. P. 23(b)(3). Further,

> "The Rule 23(b)(3) predominance inquiry tests
> whether proposed classes are sufficiently cohesive
> to warrant adjudication by representation." In
> order to meet the predominance requirement of Rule
> 23(b)(3), a plaintiff must establish that "the
> issues in the class action that are subject to
> generalized proof, and thus applicable to the class
> as a whole, . . . predominate over those issues
> that are subject only to individualized proof."

Visa, 280 F.3d at 136 (quoting Amchem Prods., Inc. v. Windsor, 521

U.S. 591, 623 (1997), and Rutstein v. Avis Rent-A-Car Sys., Inc.,

211 F.3d 1228, 1233 (11th Cir. 2000)).

Defendants contend that plaintiffs do not meet the Rule

23(b)(3) predominance requirement because they cannot show that

antitrust impact on the members of the class can be established by

generalized proof applicable to the class as a whole, but rather

requires individualized proof. "The common question requirement of

Rule 23(a)(2) and the predominance requirement of Rule 23(b)(3)

overlap. However, the predominance requirement is far more

stringent than the common question requirement." Continental

Orthopedic Appliances, Inc. v. Health Ins. Plan of Greater New

York, Inc., 198 F.R.D. 41, 44 (E.D.N.Y. 2000) (citation omitted).

**8.**

"In order to prevail on their price-fixing claims, plaintiffs must demonstrate: (1) a violation of the antitrust laws by defendants; (2) some injury to plaintiffs' business or property as a result of the violation (causation or 'impact') and (3) the amount of damages sustained by the plaintiffs." Indus. Diamonds, 167 F.R.D. at 381 (citations omitted). See also Continental Orthopedic, 198 F.R.D. at 44. The second element -- injury or impact -- is essential. "For any antitrust violation, 'a plaintiff must make some showing of actual injury attributable to something the antitrust laws were designed to prevent.'" Visa, 280 F.3d at 133-34 n.5 (quoting J. Truett Payne Co. v. Chrysler Motors Corp., 451 U.S. 557, 562 (1981)). The injury or impact requirement is rooted in the language of Section 4 of the Clayton Act, 15 U.S.C. § 15. See Argus, Inc. v. Eastman Kodak Co., 801 F.2d 38, 41 (2d Cir. 1986).

> On a motion for class certification, the issue confronting the court is whether the proof necessary to demonstrate impact as to each class member is particular to that class member, in which case individual questions concerning impact would overwhelm the common questions concerning the existence and scope of the alleged conspiracy, or whether the necessary proof of impact would be common to all class members and sufficiently generalized that class treatment of their claims would be feasible.

Indus. Diamonds, 167 F.R.D. at 382.

Defendants argue that:

> Here the gravamen of plaintiffs' price-fixing claim
> is that in a majority of IPOs in plaintiffs'
> selected range of $20 million to $80 million,
> issuers paid an allegedly "standardized" gross
> spread of seven percent that was set by the
> underwriters pursuant to an alleged conspiracy.
> The question of "impact" in this case, therefore,
> requires the trier of fact to determine whether an
> issuer would have paid a gross spread of less than
> seven percent for the same or greater net IPO
> proceeds in the absence of the alleged
> standardization. Plainly, an issuer would not have
> been injured by the defendants' alleged conduct if
> that issuer would have paid a gross spread in
> excess of seven percent absent the alleged
> standardization. Indeed, such an issuer would have
> benefited from the "standardization" of gross
> spreads at seven percent. Similarly, an issuer who
> would have received lower net proceeds from its IPO
> if it paid a gross spread of less than seven
> percent absent the alleged standardization would
> not have been injured by the alleged conspiracy.

(Defs'. Opp'n. at 26-27 (citations omitted).)

In support of their argument, defendants offer the report
of their expert economist, Robert D. Willig, who was asked by
defendants "to consider whether the plaintiffs' allegations that
members of the proposed issuer class have been injured by the
alleged price-fixing conspiracy are capable of being proved on a
common basis for the purported class members." (Willig Report ¶ II
(in Withers Decl., May 24, 2005, Ex. 19).) He responds (in
summary):

> It is my opinion that any determination of whether
> a particular member of the purported issuer class
> has been injured by the clustering or alleged
> "standardization" of gross spreads would require an
> individualized factual analysis about whether,
> absent such alleged standardization, the issuer
> would have paid a gross spread of less than 7% for

> IPO net proceeds, the same or equal to the proceeds
> the issuer actually received as a result of its
> offering. This determination, in my opinion, would
> necessarily require an analysis of multiple factors
> that, as the parties agree and the economic
> literature and the record evidence in this case
> indicate, may be relevant to how gross spreads and
> net proceeds are or could be determined for IPOs
> within the narrow range alleged in the complaint.

(<u>Id.</u> ¶ III.)[5]  He also states that, "[i]n a conspiracy to

'standardize' prices that would otherwise be variable, such as that

alleged by the plaintiffs, one cannot presume as a matter of

economics that every buyer who purchased services at the

standardized price was injured by the conspiracy.  Rather, price

could be variable both above and below the allegedly standardized

price."  (<u>Id.</u> ¶ V.)

After describing the IPO process -- with particular

emphasis on "firm commitment" IPOs (<u>id.</u> ¶ IV)[6] --, the services

rendered by underwriters (<u>id.</u> ¶ IV. A), competition among

underwriters (<u>id.</u> ¶ IV. B), underwriter compensation and risk (<u>id.</u>

¶ IV. C), and plaintiffs' allegations (<u>id.</u> ¶ V), Professor Willig

goes on to consider how to answer the question put to him:  "to

determine whether a member of the proposed class was injured one

---

[5] "Gross spread" is defined as "the difference between the price
paid to the issuer and the price received from the investors."  (<u>Id.</u> ¶
IV. C (footnote omitted).)

[6] Plaintiffs allege that "[e]quity IPO offerings typically are 'firm
commitment' underwritings. As such, the issuer company, <u>i.e.,</u> plaintiff
herein, sells all of the shares of stock offered in the IPO to the
underwriters in the syndicate, and the underwriters take title to the IPO
stock."  (Consolidated Class Action Compl., ¶ 11.)

must make a prediction of what the issuer's gross spread would have been in the absence of the alleged conspiracy, <u>i.e.</u>, the but-for gross spread," and also whether, if the gross spread were lower, the IPO net proceeds would have been lower than those actually received. (<u>Id.</u> ¶ VI. A.)

> The net value of an offering to an issuer is the amount of proceeds raised minus the spread paid to the underwriters plus the value of services received from the underwriters minus any other costs or fees paid by the issuer. An issuer has only been injured if this net value in the but-for world is greater than the actual net value. Because underwriting services are not fungible products but, rather, are customized by differentiated underwriter suppliers for each issuer (<u>i.e.</u>, no one bundle of underwriting services provided by one underwriter is identical to the underwriting services provided by another), an assessment of whether a particular issuer's net proceeds were reduced by the alleged conspiracy involves an individualized inquiry based on non-common factors that will vary from one issuer and IPO to the next.

(<u>Id.</u>) The Willig Report then goes on to identify ten factors requiring individualized analysis to answer the question whether there has been the necessary antitrust injury in the case of a particular member of the issuer class. They are:

> 1) underwriter costs; 2) analyst coverage; 3) price stabilization and market making; 4) other underwriter compensation; 5) regulatory issues; 6) prospective issuer investment banking business; 7) the risk of the offering; 8) underwriter prestige and reputation; 9) share pricing; and 10) syndicate composition. A fact-finder would have to evaluate not only these ten factors individually, but would also have to take account of possible interactions among them.

(<u>Id</u>. ¶ VI. B.)[7]

## 9.

Plaintiffs' responsive arguments in support of Rule 23 (b)(3) certification of the issuer class are several.

First, plaintiffs argue, citing principally <u>In re Master Key Antitrust Litigation</u>, 528 F. 2d 5 (2d Cir. 1975), and <u>Indus. Diamonds</u>, 167 F.R.D. 374, that, in the case of a horizontal price-fixing conspiracy there is a presumption of class wide impact. In <u>Master Key</u>, on an appeal from a class certification order, which appeal it dismissed for lack of jurisdiction, the Second Circuit said:

---

[7] Plaintiffs' expert economist, Gustavo Bamberger, in his Declaration, also identifies factors on which IPO fees may depend:

> Issuer firm industry (e.g., fees may be higher for firms in relatively risky industries, such as biotechnology);
>
> Underwriter firm quality (e.g., investment firms that offer higher quality service may be able to charge higher fees);
>
> Whether the IPO is a privatization of a government-owned enterprise;
>
> Extent of "underpricing" e.g., fees may be lower if initial price is relatively low;
>
> The year in which the IPO took place; and
>
> Type of IPO process used (e.g., "bookbuilding" vs. fixed price).

(Bamberger Decl. ¶ 22 (footnotes omitted) (in Berger Aff., Sept. 16, 2004, Ex. C).) While the experts' lists of factors are not identical, plaintiffs' expert agrees that, "[i]n general, each member of the proposed class can have a different but-for IPO fee." (<u>Id</u>. ¶ 24.)

> If the appellees establish at the trial for
> liability that the defendants engaged in an
> unlawful national conspiracy which had the effect
> of stabilizing prices above competitive levels, and
> further establish that the appellees were consumers
> of that product, we would think that the jury could
> reasonably conclude that appellants' conduct caused
> injury to each appellee. The amount of such injury
> could then be computed at a separate trial for
> damages, and appropriate substratification of
> classes could be utilized to facilitate that
> determination.

58 F. 2d at 12 n. 11 (citations omitted). In Industrial Diamonds,

Judge Conner referred to the fact that "[s]ome courts have held

that common questions predominate because 'as a general rule, an

alleged price-fixing scheme presumptively impacts upon all

purchasers of a price-fixed product in a conspiratorally affected

market.'" 167 F.R.D. at 382 (quoting In re Alcoholic Beverages

Litigation, 95 F.R.D. 321, 327 (E.D.N.Y. 1982) (footnote

omitted))[8]. But he also pointed out that the above-quoted

statement from Master-Key, 528 F. 2d at 12 n. 11, was dictum and

that "[o]ther courts have stressed the need for a careful

examination of the facts of each case in order to determine whether

common proof of impact is possible." 167 F. Supp. at 382

(citations omitted). If there is such a presumption as plaintiffs

urge -- and that is doubtful since injury or impact is a necessary

element of a price fixing claim, see, e.g., Visa, 280 F.3d at 133-

---

[8] Alcoholic Beverages, as Judge Conner pointed out, relied on the
above-cited Master Key footnote. See Indus. Diamonds, 167 F. Supp. at
382 n.7.

34 n.5 -- then it does not apply here where an independent inquiry is required in the case of each member of the issuer class.[9]

Plaintiffs also urge that "[c]onspiracy is so central to a price-fixing claim that proof of it on a class-wide basis necessarily overwhelms the importance of individual proof that may otherwise be needed to show impact." (Pls'. Reply Mem. at 29-30 (citing Visa, 280 F.3d at 139 ("it has been commonly recognized that the necessity for calculation of damages on an individual basis should not preclude class determination when the common issues which determine liability predominate")).)[10] In Visa however, as thus cited by plaintiffs, the Second Circuit was discussing common proof of damages, not of injury or impact. Antitrust injury or impact is quite distinct from damages. Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 562 (1931).

Plaintiffs also argue that they are able to prove antitrust impact with common proof, and offer their expert economist's analysis (submitted prior to defendants' submission of Professor Willig's Report) in support of their position. Again,

---

[9] If such a presumption should ever apply, it should be in cases involving fungible or near fungible products. See, e.g., Magnetic Audiotape Antitrust Litig., No. 99 Civ. 1580, 2001 WL 619305, at *7 (S.D.N.Y. June 6, 2002) ("[D]efendants operated in the same markets with almost identical products . . .").

[10] The quotation from Visa represents a quotation by the Second Circuit of Bogosian v. Gulf Oil Corp., 561 F.2d 434, 456 (3d Cir. 1977).

however, plaintiffs are ignoring the distinction between antitrust injury or impact, on the one hand, and damages, on the other.

Doctor Bamberger was asked by counsel for the issuer plaintiffs

> to determine whether it would be possible to measure damages suffered by members of a proposed class of all corporations and other entities (excluding defendants and issuers of government securities) that issued an initial public offering of securities with an aggregate value between $20 million and $80 million . . . by the use of a formula common to all class members.

(Bamberger Decl. ¶ 3.) He responded that, "[b]ased on my review of the available economic evidence, I conclude that it would be possible to estimate damages with such a formula." (Id.) He explains the background to the case (id. ¶¶ 4-7), how a benchmark period or area could be chosen against which IPOs of the alleged magnitude in the conspiracy period in the United States could be measured (id. ¶¶ 8-15), and how multiple regression analysis could be used to estimate but-for prices for a benchmark period or area (id. ¶¶ 16-19). Multiple regression analysis, Doctor Bamberger adds, can be used to evaluate the effect of the factors he has identified (see above) and others on IPO fees. (Id. ¶ 23.) As noted above, he acknowledges that each proposed class member can have a different but-for IPO fee. (Id. ¶ 24.)

The Second Circuit has made it clear that "a district court may not weigh conflicting expert evidence or engage in

'statistical dueling' of experts." <u>Visa</u>, 280 F.3d at 135.  This
Court will not do so.

Doctor Bamberger and Professor Willig have been asked,
and have answered, meaningfully different questions.  Accepting
both opinions as "not fatally flawed" and "sufficiently reliable,"
<u>Visa</u>, 280 F.3d at 135, the Court must and does accept Professor
Willig's analysis because it addresses the question before the
Court -- which is whether antitrust injury or impact can be proved
by evidence common to the class.  Doctor Bamberger's analysis does
not defeat or neutralize that of Professor Willig because it
answers a different question.[11]  The questions are different because
there is considerable leeway allowed in proving damages, once
antitrust liability is established, than is permitted in proving
antitrust liability.

> [O]nce proof of injury causation has been
> established, courts have allowed antitrust
> plaintiffs considerable latitude in proving the
> amount of damages.  Proof of amount of damages thus
> need not conform to a particular theory or model,
> and exact proof of the amount of damages is not
> required.  An antitrust plaintiff must thus provide
> only sufficient evidence to support a "just and
> reasonable estimate" of damages.

<u>U.S. Football League v. Nat'l Football League</u>, 842 F.2d 1335, 1378
(2d. Cir. 1988) (quoting <u>Bigelow v. RKO Radio Pictures, Inc.</u>, 327
U.S. 251, 264 (1946)) (other citations omitted).  This approach to

---

[11] Plaintiffs did not submit a report by Doctor Bamberger responding
to Professor Willig's report.

damages, however, does not apply to liability, and antitrust injury or impact is an element of an antitrust claim, without proof of which there is no liability(and hence no occasion to consider damages).  See <u>Visa</u>, 280 F. 3d at 133-34 n.5 & 136; <u>see also</u> <u>Story Parchment</u>:

> It is true that there was uncertainty as to the extent of the damage, but there was none as to the fact of damage; and there is a clear distinction between the measure of proof necessary to establish the fact that petitioner had sustained some damage, and the measure of proof necessary to enable the jury to fix the amount.  The rule which precludes the recovery of uncertain damages applies to such as are not the certain result of the wrong, not to those damages which are definitely attributable to the wrong and only uncertain in respect of their amount.

282 U.S. at 562 (citation omitted).

Here, according to Doctor Bamberger, "but-for IPO fees can be estimated for each member of the purported issuer class." (Bamberger Decl. ¶ 24.)  Such might be a sufficient approach to proof of damages, but it is not a sufficient approach to proof of an element necessary for a finding of liability.[12]

---

[12]  Plaintiffs argue that Professor Willig agrees that Doctor Bamberger's method could be utilized to prove impact.  "When asked at deposition whether regression analysis could reliably be used to demonstrate common impact in an antitrust price-fixing case, defendants' expert responded by saying that it would be [a] 'sufficiently reliable tool to handle that sort of question.'"  (Pls'. Reply Mem. at 40 (quoting Willig Dep. 88, Sept. 15, 2005 (in Berger Reply Decl., Oct. 20, 2005, Ex. F).); <u>see also</u> Pls'. Prop. Resp. To Def. Prop. Sur-Reply at 5-6.)  But Professor Willig's complete answer to the question was:

> I would agree that there are circumstances in which regression analysis might be a valid tool, sufficiently reliable tool to handle that sort of question.

Plaintiffs have failed to show that an essential element of their price-fixing claim -- antitrust injury or impact -- can be proved by evidence common to the class, rather than on an individual basis, and have thereby failed to satisfy Rule 23(b)(3) as to the issuer class.

**10.**

The issuer plaintiffs seek "a declaration that the alleged conspiracy constitutes an unlawful restraint of trade, and an injunction barring defendants from continuing to conspire." (Pls'. Mem. at 22 (citations omitted).) They seek certification of an issuer plaintiff class pursuant to Rule 23(b)(2) to pursue that claim.[13]

"Subsection (b)(2) . . . is only applicable where the relief sought is exclusively or predominantly injunctive or declaratory." Eisen v. Carlisle & Jacquelin, 391 F.2d 555, 564 (2d Cir. 1968), vacated on other grounds, 417 U.S. 156 (1974). See also Robinson v. Metro-North Commuter R.R. Co., 267 F.3d 147, 163

---

It's also true that in other circumstances, it could not be a sufficiently reliable tool, and if in fact one overlooked the reasons for its unreliability in such instances, it would become a dangerous tool that's bound to give mistaken results.

(Willig Dep. 88.) That does not suggest agreement in the present case.

[13] That the purchaser plaintiffs have standing to pursue injunctive relief, In re Public Offering Antitrust Litig., No. 98 Civ. 7890, 2004 WL 350696 at *8 (S.D.N.Y. Feb. 25, 2004), does not in itself mean that certifying a purchaser class is appropriate.

(2d Cir. 2001) (citing <u>Eisen</u>, 391 F.2d at 564).  In <u>Robinson</u>, the
Second Circuit said that:

> Although the assessment of whether injunctive or
> declaratory relief predominates will require an ad
> hoc balancing that will vary from case to case,
> before allowing (b)(2) certification a district
> court should, at a minimum, satisfy itself of the
> following:  (1) even in the absence of a possible
> monetary recovery, reasonable plaintiffs would
> bring the suit to obtain the injunctive or
> declaratory relief sought; and (2) the injunctive
> or declaratory relief sought would be both
> reasonably necessary and appropriate were the
> plaintiffs to succeed on the merits.

267 F.3d at 164.

In response to defendants' argument that no "member of
the proposed issuer class faces any prospective harm, either actual
or threatened, which could be remedied through injunctive or
declaratory relief.  Their objective is monetary relief . . ."
(Defs'. Opp'n at 45), plaintiffs say that the issuer plaintiffs
have asserted their "intention to eliminate the alleged price-
fixing, restore integrity to the market, and protect other
purchasers from harm" and testified that "they might purchase IPO
stocks in the future."  (Pls'. Reply Mem. at 48 (citations
omitted).)

It is difficult to imagine that a purchaser class would
wish to proceed in order to obtain declaratory or injunctive relief
alone without any prospect of recovering any damages themselves and
without the assistance of an issuer class seeking treble damages.
It is not clear, however, whether the purchaser plaintiffs have

considered such an eventuality, and the Court will allow them to submit a letter within 14 days of the date hereof specifying their intentions in this regard, as well as addressing the _Robinson_ test quoted above and stating whether they believe a hearing is necessary, _see_ _Parker v. Time Warner Ent. Co._, 331 F.3d 13, 20-21 (2d Cir. 2003), and, if so, what evidence they would present at a hearing. Defendants are to respond within the next 7 days, and plaintiffs may reply within a further 4 days.

## 11.

For the reasons set forth above: (i) plaintiffs' motion for an order certifying an issuer class in 00 Civ. 7804 is denied because of plaintiffs' failure to satisfy Rules 23(a) and 23(b)(3); and (ii) plaintiffs' motion for an order certifying a purchaser class in 98 Civ. 7890 will be decided upon receipt of the further submissions described in Section 10 of this Memorandum and Order.[14]

SO ORDERED.

Dated: April 18, 2006

Lawrence M. McKenna
U.S.D.J.

---

[14] Defendants' time to respond to plaintiffs' motions for (i) leave to amend the Consolidated Class Action Complaint and (ii) summary judgment is extended to 30 days after decision on plaintiffs' motion for certification of a purchaser class in 98 Civ. 7890.